# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| PAUL C. TEEGARDEN, Jr., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-0507-CV-W-NKL-SSA |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |

## ORDER

Pending before the Court is Plaintiff Paul C. Teegarden's Motion for Summary Judgment [Doc. # 5]. Teegarden seeks judicial review of the Commissioner's denial of his request for disability insurance benefits under Title II of the Social Security Act ("the Act"). The Administrative Law Judge ("ALJ") found that Teegarden was not under a disability as defined in the Act, and such determination became the final decision of the Commissioner when the Appeals Council denied Teegarden's request for review. Teegarden has exhausted his administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g).

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] Because the Court concludes that the ALJ

---

[1] Portions of the Parties' briefs are adopted without quotation designated.

1

did not adequately consider Teegarden's pain, this matter is remanded to Defendant for further consideration.

**I.     Facts**

Teegarden filed his application for disability benefits on November 27, 2003. (Tr. 50-52). In his application, he alleged that he became disabled on February 20, 2003. (Tr. 50). In his Disability Report, he alleged disability due to high blood pressure, arthritis, and knee, elbow and right wrist injuries. (Tr. 101).

   **A.     Testimony of Paul Teegarden**

At his September 8, 2005 hearing, Teegarden testified that he is a 49 year old high school graduate who labored as a union iron worker for 30 years. (Tr. 228). He is five feet ten inches tall and weighs 290 pounds. (Tr. 238). Teegarden testified that he injured his knee on the job in December 2002 and had surgery on his knee in March 2003. (Tr. 219-20). Teegarden further testified that he did not get a less strenuous job because the combination of problems from his knees and arms made it hard for him to sit for prolonged periods. Specifically, Teegarden stated that the company's insurance doctors said he could not work anymore. Teegarden testified that he receives medical disability from the Iron Workers' Union[2] and a pension of $2,300 a month. He admitted that he would lose his pension if he had a full time job. (Tr. 221-22).

---

[2] The Mo-Kan Iron Workers' Pension Fund allows disability payments if a participant, on the basis of medical evidence, will be permanently and continuously disabled during the remainder of his life such that he is precluded from engaging in gainful employment.

2

Teegarden testified regarding his daily activities. According to Teegarden, he lives with his mother in a second floor apartment. He is able to take care of his own personal needs and drives to a laundromat six blocks away to do his laundry because he is unable to access the basement-level laundry facilities in his apartment building. He testified that he does no cooking, cleaning or yard work. He testified that he goes grocery shopping with his mother once a week. (Tr. 232-34).

Teegarden stated that he can walk only short distances and for only 15 or 20 minutes. (Tr. 234-35). He testified that, on orders from his doctors, he keeps his legs elevated as often as he can, which results in his legs being elevated to heart level about three to four hours each day. If he does not elevate his legs, his knees swell. (Tr. 245-46). Teegarden further testified that his knee gives out on him once or twice a week causing him to fall down. (Tr. 246).

Teegarden testified that he attends Mason meetings and entertains relatives once a month. (Tr. 235-36). In addition, Teegarden testified that he hunts but stopped hunting two years prior to the hearing. Teegarden testified that he used to be a competitive archer but he was no longer able to be competitive because he could not lock his knees. He last practiced archery in April 2005, five months prior to his hearing. (Tr. 240-41). He also went fishing with his grandchildren a few months prior to the hearing. (Tr. 242).

Teegarden testified that if he worked full time, he would miss several days a week because of pain. He stated he could not sit more than 45 minutes to an hour. He explained that he has to get up and move around because his feet swell. If he has to do

3

any walking, his knees give out. (Tr. 231, 246).

### B.  Summary of Medical and Documentary Evidence

On February 10, 2003, Teegarden underwent a magnetic resonance imaging (MRI) of the right knee, which revealed, among other things, tears of the posterior horn medial meniscus and anterior horn of the lateral meniscus. (Tr. 157).

Ten days later, Steven Smith, M.D., examined Teegarden. After reviewing the results of the February 10 MRI, Dr. Smith diagnosed Teegarden with "[p]robable right ACL disruption with meniscal tears." (Tr. 146). Dr. Smith recommended that Teegarden undergo a knee arthroscopy, a partial removal of his meniscus and ACL reconstruction. Dr. Smith placed Teegarden on work restrictions which included no squatting, kneeling, crawling or climbing. (Tr. 146). On March 11, 2003, Dr. Smith performed the previously recommended knee surgery on Teegarden. (Tr. 140).

During the next few months, Dr. Smith conducted several follow up examinations of Teegarden's knee. Until April 21, 2003, Dr. Smith had Teegarden on sit-down-only restrictions. On April 21, 2003, Dr. Smith concluded that Teegarden's knee had healed enough to amend his work restriction from sit-down-only to 75% standing and 25% sitting with no climbing or crawling. (Tr. 165). Dr. Smith evaluated Teegarden approximately every four weeks until September 8, 2003. He did not materially alter Teegarden's work restriction after evaluating him on June 2, 2003, though on at least two occasions, Dr. Smith indicated that Teegarden's knee was causing him some irritability and pain. (Tr. 161-68).

4

On September 25, 2003, Roger W. Hood, M.D., examined Teegarden. Dr. Hood noted that Teegarden has some tenderness around the knee, but that his knee was otherwise unremarkable. Dr. Hood indicated in his notes that Teegarden had returned to work in July 2003. On his second day back at work, Teegarden felt a large pop in his knee while twisting. He has had trouble with his knee ever since. (Tr. 143).

Three days after Dr. Hood's examination, Teegarden's knee underwent a second MRI. (Tr. 144). On September 30, 2003, Dr. Hood concluded that these most recent MRI results showed "nothing new." Dr. Hood indicated that Teegarden's ACL reconstruction was intact with no evidence of any meniscal tear. He "guessed" that Teegarden's symptoms resulted from arthritis. (Tr. 142).

On May 18, 2004, Dr. Truett L. Swaim performed a consultative examination of Teegarden. Dr. Swaim's notes indicate that, at the time of the examination, Teegarden continued to have right knee pain, which included an aching sensation and occasional sharp pain. Teegarden sometimes experiences a "locking" sensation and at other times a "giving way" sensation with his right knee. He also has occasional swelling of the right knee. Teegarden's discomfort is worsened by climbing stairs, prolonged standing, prolonged walking, navigating uneven ground, prolonged driving and lifting. The discomfort is improved by lying down and elevating the leg. Teegarden indicated, that during the previous month, the pain averaged a 6 on a scale of 1 to 10 with a high of 8 and a low of 2. He also complained of chronic aching of both elbows related to pre-existing injuries, with frequent popping in the elbows; weakness, discomfort, and range of

5

motion loss of the right wrist related to a pre-existing injury; and discomfort and popping of the left knee related to a pre-existing injury. (Tr. 183-187).

Dr. Swaim's physical examination revealed that Teegarden was 5'10" and weighed 288 pounds. The examination also revealed that Teegarden had decreased sensation in his neck and right arm as well as tenderness in his right elbow. Both Teegarden's knees had at least some tenderness and the right knee had moderate instability. Dr. Swaim further indicated that there was a popping sensation with associated pain in the right knee. (Tr. 189-90).

With respect to Teegarden's work capacity, Dr. Swaim concluded as follows:

> He is capable of working. He should restrict occupational stresses to a light to medium work level according to the U.S. Department of Labor, *Dictionary of Occupational Titles*. With the ability to exert between 15 and 40 pounds of force on an occasional basis, and/or between 5 and 15 pounds of force on a frequent basis, and/or up to 5 pounds of force on a constant basis, to move objects. He should avoid heights, repetitive twisting, repetitive squatting, climbing, kneeling, crawling. He should avoid prolonged standing or walking. He should avoid repetitive forceful use of the right upper extremity.

(Tr. 191). Dr. Swaim also concluded that Teegarden should not return to his job as an iron worker; and, given his age, educational background and occupational history, Dr. Swaim doubted that Teegarden could obtain or maintain gainful employment. (Tr. 191).

Finally, in a letter dated January 12, 2005, Dr. Hood indicated that the medial joint space in Teegarden's right knee had narrowed from over one quarter of an inch to about an eighth of an inch in the last 18 months with knee pain increasing in proportion to the

6

narrowing.  Dr. Hood believed that Teegarden was a candidate for knee replacement and that knee replacement was the only thing that would give him satisfactory improvement in pain and function.  (Exhibit A/2).

### C. Testimony of Vocational Expert

Jane Gerrish testified at the hearing as a vocational expert ("VE").  She stated that Teegarden had past relevant work as an iron worker in construction, which she classified as heavy, skilled work.  (Tr. 227-28).  The ALJ posed a hypothetical question in which he assumed Teegarden's age, education, and past relevant work.  In addition, he asked the VE to assume a residual functional capacity as set out by Dr. Swaim.  (Tr. 228-29).  The VE testified that such an individual could not perform Teegarden's past relevant work as an iron worker, but could perform sedentary work which would include dowel inspector, final assembler and ticket counter.  (Tr. 229-30).  In response to questioning from Teegarden's counsel, the VE testified that these sedentary jobs would not allow for an individual to sit with their feet elevated and would not allow for absences once or twice a week.  (Tr. 247).

## II. Discussion

The Court's role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Nicola v. Astrue*, 2007 WL 913812, *1 (8th Cir. 2007).  "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion."  *Id*.

Teegarden argues that the ALJ failed to properly perform an analysis under

*Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) with respect to his subjective complaints of pain. Under *Polaski*, to evaluate a claimant's subjective complaints,

> the ALJ, in addition to considering the absence of an objective medical basis which supports the degree of severity of subjective complaints, must examine the claimant's prior work record and observations of third parties and physicians relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

*Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (citations and quotations omitted).

Teegarden's subjective complaints of pain are supported by the objective medical evidence in the record, including Drs. Swaim's and Hood's reports. Notwithstanding the medical evidence, the ALJ found that Teegarden's subjective complaints were not fully credible. The Eighth Circuit Court of Appeals has repeatedly held that "before an ALJ may reject a claimant's subjective complaints of pain, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that lead the ALJ to reject the claimant's complaints of pain." *Douthit v. Bowen*, 821 F.2d 508, 509 (8th Cir. 1987) (citations omitted).

The ALJ found Teegarden's complaints not fully credible because Teegarden "cares for his personal needs, pays bills, cooks and occasionally does dishes, does his laundry (6 blocks away), and shops." (Tr. 20). In addition, the ALJ found that Teegarden "walks 15 to 20 minutes; socializes occasionally with family, goes out once monthly, does jigsaw puzzles/board games, and plays cards." (Tr. 20). Finally, the ALJ found that

8

Teegarden "hunts, fishes, camps, and does archery. He wore a knee brace when he went bow hunting in 2002 , practiced shooting in April 2005, and went to a fishing derby in July 2005." (Tr. 20). The Court finds the ALJ's reasons for rejecting Teegarden's subjective complaints of pain insufficient for the following reasons:

First, the Court finds that the ALJ has not fully explained Teegarden's activities. For example, Teegarden did testify that he takes his laundry by truck to a laundromat that is six blocks from his home, but he also testified that he did this because he is unable to carry the laundry down the stairs to the basement of his apartment building where the on-site washing machine is located. (Tr. 233). And, Teegarden did testify that he shops, but only once a week for groceries with his mother. (Tr. 234). In addition, the ALJ overstated Teegarden's outdoor activities. The record reflects that Teegarden last went bow hunting in 2003 and there is only one mention in the record of fishing, that being when Teegarden baited the hooks for his grandchildren at a fishing derby. (Tr. 241-42). Teegarden also testified that he likes to hunt, but that he is unable to "because [he] cannot walk that long." (Tr. 242). Simply put, Teegarden does not seem to be the avid sportsman the ALJ suggests.

Second, none of the activities cited by the ALJ as reasons for rejecting Teegarden's subjective complaints support the ALJ's conclusion that Teegarden can do full-time work in the competitive local or national economy. *See Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995) (claimant lived with her mother and cooked twice a day, washed dishes, made beds, did laundry twice a week, cleaned house twice a week, went

9

shopping and drove a car); *Harris v. Secretary of DHHS*, 959 F.2d 723, 726 (8th Cir. 1992) (claimant shopped for food, children's school supplies, and household items; drove a car on occasion; did some cooking, ironing and laundry).

Third, the Eighth Circuit, while conceding that an employer's disability determination is not binding on an ALJ, has held that such determinations are "entitled to some weight and deserve[], at the least, further investigation into how different the standards actually are." *Turpin v. Bowen*, 813 F.2d 165, 172 (8th Cir. 1987). Here, the ALJ gave no consideration to the fact that Teegarden receives disability benefits from his previous employer.

Therefore, substantial evidence does not support the ALJ's determination that Teegarden's subjective complaints of pain are not fully credible. As a result, pain-related limitations should not have been completely excluded from the RFC or the hypothetical asked of the vocational expert. *Stormo v. Barnhart*, 377 F.3d 801, 808-09 (8th Cir. 2004) (holding that hypothetical is sufficient if it sets forth impairments supported by substantial evidence and accepted as true by the ALJ).

## III. Conclusion

Accordingly, it is hereby

ORDERED that Teegarden's Motion for Summary Judgment [Doc. # 5] is GRANTED IN PART. Pursuant to sentence four of Section 205(g) of the Social Security Act, this matter is REMANDED to Defendant for further consideration consistent with this order.

10

                                                <u>s/ Nanette K. Laughrey</u>
                                                NANETTE K. LAUGHREY
                                                United States District Judge

Dated: <u>April 20, 2007</u>
Jefferson City, Missouri